# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State ex. rel. Monica Boggs**
**Petitioner Below, Petitioner**

**vs.)  No. 18-1105** (Berkeley County 13-C-321)

**J.D. Sallaz, Superintendent,**
**Lakin Correctional Center**
**Respondent Below, Respondent**

**FILED**
**June 18, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Monica Boggs, by counsel Kevin D. Mills and Shawn R. McDermott, appeals the Circuit Court of Berkeley County's November 19, 2018, order denying her petition for writ of habeas corpus. Respondent State of West Virginia by counsel Elizabeth Grant, filed a response in support of the circuit court's order and a supplemental appendix. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On the night of August 19, 2008, petitioner called 911 to report the presumed death of her seven-month-old child ("the child"). The child was subsequently transported to a nearby hospital where he was pronounced dead. The following day, Medical Examiner Dr. Matrina Schmidt conducted an autopsy of the child and determined that the child had sustained brain hemorrhaging and a fracture "completely through the skull." The cause of the child's death was determined to be blunt force trauma to the skull and was ruled a homicide.

On August 20, 2008, after receiving the results of the child's autopsy, Sgts. Kevin Pansch and David Boober of the West Virginia State Police interviewed petitioner. Petitioner came voluntarily to the police station for the interview, at the request of Sgt. Boober. At the time of her interview, petitioner was not handcuffed or physically restrained, was advised that she was not under arrest, and was free to leave at any time. Petitioner was advised of her *Miranda*[1] rights and

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

1

signed a waiver of those rights. Over the course of a series of successive interviews, petitioner's statements evolved. Ultimately, petitioner "dropped her head and . . . advised that she had killed her baby." Specifically, petitioner told the officers that she had thrown the child into his crib, where the child struck his head on a toy piano that petitioner did not know was in the crib. Petitioner did not report this incident to anyone and stated that thereafter, the child seemed fine and drank a bottle. Petitioner repeatedly advised officers that she did not mean to hurt the child. Additionally, petitioner told officers that on August 14, 2008, prior to the incident at issue, she had thrown a bottle into the child's crib, striking him in the eye.

Petitioner was indicted in the Circuit Court of Berkeley County on three felony counts related to the death of her child: death of a child by a parent, for throwing the child into the crib; child abuse causing bodily injury, for throwing the bottle at the child; and gross child neglect creating a substantial risk of bodily injury, for failing to obtain medical treatment for the child.

During the course of trial preparation, petitioner's retained counsel, B. Craig Manford, investigated the voluntariness of petitioner's statements to Sgts. Pansch and Boober and hired Dr. Bernard Lewis, a clinical and forensic psychology expert, to complete an evaluation of petitioner. Dr. Lewis opined that, while petitioner was under a great deal of stress and distress, her statements to Sgts. Pansch and Boober "were, in fact, voluntary."

Following a three-day trial in September of 2009, petitioner was found guilty on all counts. Ultimately, the circuit court sentenced petitioner to a determinate term of 40 years of incarceration for her conviction of death of a child by a parent; the statutory term of one to five years for child abuse causing bodily injury; and the statutory term of one to five years for gross child neglect causing substantial risk of serious bodily injury. Petitioner's sentences were ordered to run consecutively.

Petitioner filed a direct appeal of her convictions, which were affirmed by this Court. *See State v. Monica Boggs*, No. 11-0001, (W. Va. May 27, 2011) (memorandum decision). On April 26, 2013, petitioner filed a petition for writ of habeas corpus and a *Losh*[2] list. Petitioner thereafter requested an omnibus evidentiary hearing on the issue of ineffective assistance of trial counsel and sought to continue all proceedings so that she could consult with expert witnesses. In her habeas petition, petitioner alleged numerous instances in which her trial counsel was ineffective, including: (1) failing to move to suppress petitioner's statements to Sgts. Pansch and Boober as involuntary, failing to adequately investigate the circumstances of the statements; and failing to request a jury instruction on the voluntariness of the statements; (2) failing to adequately investigate the State's medical evidence and the opinion of the State's medical expert regarding the child's injuries; (3) failing to adequately conduct voir dire; (4) failing to object to the State's use of a gruesome autopsy photo in closing; (5) conceding the intent element of the offense; and (6) failing to request a continuance of trial.

The State objected to the holding of an omnibus evidentiary hearing and argued that there was sufficient evidence in the record to address all of petitioner's habeas claims. By order entered

---

[2] *See Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

on September 21, 2015, the circuit court concluded that petitioner failed to allege any set of facts upon which habeas relief could be granted and that no evidentiary hearing was required. Petitioner appealed the circuit court's denial of her habeas petition to this Court. By decision dated November 7, 2016, this Court reversed the circuit court's denial of petitioner's habeas petition and remanded the matter to the circuit court for an evidentiary hearing. *See Monica Boggs v. Lori Nohe*, No. 15-1001, 2016 WL 6576891 (W. Va. Nov. 7, 2016) (memorandum decision).

Upon remand to the circuit court, an omnibus evidentiary hearing was held over the course of three dates: March 7, 2017, June 2, 2017, and September 20, 2017. Petitioner's trial counsel; Sgts. Boober and Pansch; Petitioner; Petitioner's retained expert Harry A. Smith, III; and one of petitioner's childhood friends testified at the hearing. Thereafter, by order entered November 19, 2018, the circuit court, in a fifty-seven page order, denied petitioner's petition for writ of habeas corpus.

In denying petitioner's petition for writ of habeas corpus, the court found that petitioner's statements to Sgts. Boober and Pansch were voluntary in nature and that her trial counsel was not ineffective in failing to move to suppress these statements prior to trial.

During his testimony at the omnibus hearing, petitioner's trial counsel testified that he talked to petitioner regarding her statements to police officers multiple times prior to trial and that petitioner never advised him that her statements were coerced or false. Further, trial counsel advised that there was no indication in the record that Sgts. Pansch or Boober threatened petitioner during her interviews. Trial counsel testified that had petitioner told him she felt coerced in providing a statements to police, that he would have filed a suppression motion. As the court noted in its order denying petitioner habeas corpus relief,

> [a]t pre-trial, the defense informed the trial court that the [p]etitioner's recorded statement was transcribed, the petitioner executed a written [*Miranda*] waiver (which execution is reflected in the recorded statement), and the [p]etitioner was evaluated by a psychologist secured by the defense who reported the [p]etitioner had the mental and psychological ability at the time of the giving of her statement to give the same freely and knowingly. The defense conceded that it had no legal grounds for a challenge to the admissibility of the statement.

Further the court found that petitioner's trial counsel was not ineffective in failing to investigate the medical evidence presented by the State or the opinions of the State's medical expert, Dr. Schmidt. Rather, the court noted that trial counsel was particularly effective in obtaining admissions from Dr. Schmidt that the child's injuries were consistent with petitioner's explanation of said injuries and that the symptoms exhibited by an infant with a subdural hemorrhage were similar to ordinary symptoms exhibited by an infant who had a cold and/or an infant who was teething.

As to the allegation that petitioner's trial counsel failed to adequately conduct voir dire so as to discover a presumptively biased juror, the circuit court found no ineffective assistance of counsel. The record reflects that on the second day of trial, a juror took the court bailiff aside and reported that she recognized a photograph of the child's biological father, contained within a

scrapbook kept by petitioner and shown to the jury, as someone she knew growing up.[3] The juror reported to the bailiff that having knowledge of the child's biological father would not affect her ability to be an impartial juror. The circuit court promptly addressed the juror's disclosure to the bailiff with counsel at a time when petitioner was present. The parties advised the court that they were in agreement that the juror's knowledge of the child's biological father would not affect the outcome of the trial and that further voir dire was not necessary. The court also noted that the brother of the alleged presumptively biased juror had been convicted of manslaughter and, as such, petitioner and trial counsel believed that the juror may be more sympathetic to petitioner and, thus, did not move to strike the juror from the panel.

Additionally, the court found no merit to petitioner's allegation that her trial counsel was ineffective in failing to object to the State's use of a gruesome photo of the deceased child in its closing argument because the photo was "wholly germane [in] establishing the elevated element of 'gross' neglect of the child" and was admitted as evidence "to demonstrate the necessary elements of the charged offenses." With regard to petitioner's allegation that her trial counsel was ineffective in conceding the "intent element of the offense," the circuit court also found no error. The court determined that petitioner failed to show that her trial counsel's performance fell below a standard of objective unreasonableness. In fact, the court noted that petitioner's trial counsel "zealously argued and briefed" the court on issues presented and the jury simply decided against those arguments based upon the facts of the case.

Finally the court found no merit to petitioner's assertion that her trial counsel was ineffective in failing to move for a continuance of petitioner's trial to allow additional time to prepare for the trial. Specifically, the court found that petitioner offered no factual basis for her allegation that counsel was ineffective for failing to request a continuance based upon his busy trial schedule, aside from the simple fact that trial counsel had completed another trial immediately prior to petitioner's trial. There is no factual basis to indicate that petitioner's trial counsel was unprepared for trial.

It is from the circuit court's November 19, 2018, order denying petitioner's writ of habeas corpus that petitioner now appeals.

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex. rel. Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner asserts a single assignment of error arguing that the circuit court erred in finding that petitioner's trial counsel was not ineffective in the six instances referenced by

---

[3] The record further reflects that the child's biological father had no contact with the child or the petitioner and was not involved in the child's life.

4

petitioner in her underlying habeas petition and noted above. Our review of the record supports the circuit court's decision to deny petitioner's petition for writ of habeas corpus. Petitioner's arguments herein were thoroughly addressed by the circuit court in its order denying petitioner habeas relief.

The circuit court's fifty-seven page order includes detailed and well-reasoned findings and conclusions as to the assignment of error now raised by petitioner on appeal. Because we find no clear error or abuse of discretion in the circuit court's order or the record before us, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised on appeal and direct the Clerk to attach a copy of the circuit court's November 19 2018, "Final Order Denying Petition for Writ of Habeas Corpus Ad Subjiciendum under W.Va. Code § 53-4A-1" to this memorandum decision.

For the foregoing reasons, we affirm the circuit court's November 19, 2018, denial of petitioner's petition for writ of habeas corpus.

Affirmed.

**ISSUED:** June 18, 2020

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

IN THE CIRCUIT COURT OF BERKELEY COUNTY, WEST VIRGINIA

STATE ex rel. MONICA BOGGS,
      Petitioner,

v.
                         Case No. 13-C-321

LORI NOHE, Warden,
Lakin Correctional Center,
      Respondent.

BERKELEY COUNTY CIRCUIT CLERK

2018 NOV 19 P 2: 05

VIRGINIA M. SINE. CLERK

## FINAL ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM UNDER W.VA. CODE §53-4A-1

On this 16th day of November, 20118, this matter came before the Court pursuant to a Petition for Writ of Habeas Corpus ad Subjiciendum filed by the Petitioner, Monica Boggs, by counsel, Kevin D. Mills, Esq. and Shawn R. McDermott, Esq., a Return to and Motion to Dismiss said Petition filed by the Respondent Warden, by counsel, Cheryl K. Saville, Assistant Prosecuting Attorney, and other filings of the parties herein. Upon direction from the West Virginia Supreme Court of Appeals, the Court held an omnibus evidentiary hearing over the course of three dates: March 7, 2017, June 2, 2017, and September 20, 2017.

The Court first reviewed the Losh list with the Petitioner in open court, and the Petitioner confirmed her waiver of those items marked as having been waived on her filed, signed and verified "Grounds for post-Conviction Habeas Corpus Relief." Based upon the written waiver and the colloquy before the Court, the Court FINDS the Petitioner is making a knowing, voluntary, free, and intelligent waiver of those issues indicated as waived in her Losh list. As such, the Court further FINDS that the Petitioner is not entitled to relief on any of the grounds contained in the filed, signed, and verified Losh list that she has expressly waived; specifically, grounds 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 23, 24, 25, 26, 27, 28, 29, 30, 32,

1

35, 36, 37, 38, 39, 40, 42, 43, 44, 46, 47, 48, 49, 52, and 53. W.Va. Code §53-4A-3(a), -7(a); Losh v. McKenzie, *infra.*; Perdue v. Coiner, *infra.*

Concerning the grounds not waived, upon the taking of evidence, review of the papers and proceedings read and had herein, review of the underlying criminal case State v. Monica Boggs, Berkeley County Case Number 09-F-6, and review of pertinent legal authorities, the Court hereby **DENIES** the Petition.

## FINDINGS OF FACT

1. The Petitioner was indicted for three (3) felony offenses: Death of a Child by a Parent, in violation of W. Va. Code § 61-8D-2a(a); Child Abuse Causing Bodily Injury, in violation of W. Va. Code § 61-8D-3(a); and Gross Child Neglect Causing Substantial Risk of Serious Bodily Injury, in violation of W. Va. Code § 61-8D-4(e). [Indictment, 2/17/09, State of West Virginia v. Monica Boggs, Case No.: 09-F-6.]

2. On September 3, 2009, following a three-day trial, the jury found the Petitioner guilty of all three felony counts, and the Court thereupon adjudged and ordered the Petitioner convicted of Death of a Child by a Parent, Child Abuse Causing Bodily Injury and Gross Child Neglect Causing Substantial Risk of Serious Bodily Injury. [Jury Verdict Form, 9/3/09, Jury Verdict Order, 10/30/09.]

3. Following the completion of both a presentence investigation report and a diagnostic evaluation at Lakin Correctional Center, and after the evidence and argument at the sentencing hearing, the Court sentenced the Petitioner to a determinate term of forty (40) years of incarceration for her conviction of Death of a Child by a Parent; the statutory term of not less than one (1) nor more than five (5) years of incarceration for her conviction of Child Abuse

2

Causing Bodily Injury; and the statutory term of not less than one (1) nor more than five (5) years of Gross Child Neglect Causing Substantial Risk of Serious Bodily Injury. The sentences were ordered to run consecutively. [Sentencing Order, 6/14/10.]

4. The Petitioner filed a timely Notice of Intent to Appeal through her newly retained counsel on or about June 29, 2010. [Notice of Intent to Appeal, 6/29/10.]

5. The Petitioner perfected her Petition for Appeal, which was fully responded to in a timely manner by the State. [Petition for Appeal, 12/6/10, Memorandum Decision, 6/30/11.]

6. The West Virginia Supreme Court of Appeals issued a Memorandum Decision and subsequent Mandate affirming the Petitioner's conviction and sentence. [Memorandum Decision, 6/30/11, Mandate, 6/30/11.]

7. On or about April 26, 2013, the Petitioner filed a verified Petition for Writ of Habeas Corpus and Losh list. [Petition for Writ of Habeas Corpus, 4/26/13, Checklist of Grounds for Post-Conviction Habeas Corpus Relief, 4/26/13.]

8. The Court held at status hearing on June 3, 2013, and directed the Respondent to file a full and complete response to said Petition. [Order from June 3, 2013, Hearing, 6/5/13.]

9. On or about September 3, 2013, the Respondent filed a timely Return to and Motion to Dismiss the petition herein. [Respondent's Return to and Motion to Dismiss Petition for Writ of Habeas Corpus, 9/3/13; Respondent's Memorandum in Support of Motion to Dismiss Petition for Habeas Corpus, 9/3/13.]

10. Thereafter, the Petitioner sought an evidentiary hearing on the issue of ineffective assistance of counsel, conceding that the other issues raised in the Petition were legal issues and/or capable of being decided upon a review of the record. The Petitioner, however, wished to continue all proceedings so that potential expert witnesses could be consulted in support of

3

Petitioner's claims. Respondent objected to the holding of an evidentiary hearing, stating that there was sufficient evidence present in the record to dispose of all of the Petitioner's claims. [Order from September 30, 2013, 10/2/13; Order Scheduling Status Hearing, 10/31/13; Order from November 3, 2013 Status Hearing, 11/7/13; Agreed Continuance Order, 2/26/14; Agreed Continuance Order, 4/21/14; Agreed Continuance Order, 6/6/14; Agreed Continuance Order, 7/28/14; Order from September 8, 2014, Status Hearing, 9/29/14.] .

11. Following the disclosure of the Petitioner's proposed expert witness and the report of that expert, and following the filing of briefs from the parties concerning the admissibility of said testimony and report, the parties entered into a stipulation whereby the Court would consider Dr. Hauda's report in assessing the Petitioner's claims without the necessity of taking testimony from Dr. Hauda. [Respondent's Motion in Opposition to the Introduction of Proposed Expert Testimony, 12/17/14; Petitioner's Response to Respondent's Motion in Opposition to the Introduction of Proposed Expert Testimony, 1/22/15; Stipulation Regarding the Report of Dr. William Hauda, 5/15/15.]

12. Thereafter, the Petitioner orally moved the Court for an evidentiary hearing for the taking of testimony from the arresting officer in the underlying felony case regarding the voluntariness of the Petitioner's statement. The Respondent objected to the holding of a hearing for this purpose, stating that the voluntariness of the Petitioner's statement to officers in the underlying felony case had been explored and could be readily determined from the record of that case. The Court agreed and directed the parties to submit proposed orders for the Court's consideration, taking into account the record of the underlying felony and the evidence introduced by the Petitioner herein with regard to the medical evidence presented in the case.

13. The Court thereafter entered an order denying the Petitioner relief. [Final Order

4

Denying Petition for Writ of Habeas Corpus Ad Subjiciendum Under W.Va. Code §53-4A-1, 9/21/15.]

14. The Petitioner appealed that order to the West Virginia Supreme Court of Appeals. Following the submission of briefs and oral argument thereon, the West Virginia Supreme Court declined to consider any of the allegations therein on the merits and remanded the matter to circuit court for an omnibus evidentiary hearing on the matters of ineffective assistance of counsel. [Memorandum Decision, 11/7/16; Dissenting Opinion, 11/7/16; Mandate, 12/7/16.]

15. The Court held hearings to take evidence in this matter on three separate dates: March 7, 2017, June 2, 2017, and September 20, 2017.

16. On March 7, 2017, the Petitioner called her former defense counsel, B. Craig Manford, Esq., who testified in pertinent part as follows:

    a. He was retained by the Petitioner at or around the time of her arrest in the underlying matter for a fee of $25,000;

    b. At the time of the start of the Petitioner's jury trial, he had a busy trial schedule and he typically has a busy trial schedule;

    c. He had requested a continuance of the jury trial, both because the Petitioner was pregnant and also because it would have been nice to have more time, but his motion was denied by the trial court;

    d. He consulted with a forensic nurse with regard to matters in the autopsy report to see if he should hire a medical expert for purposes of trial;

    e. He did not ultimately use testimony from the forensic nurse at trial and did not retain any further medical expert;

5

f. He did not consult with any expert concerning the force it would take to break an infant or adult skull because such issues were not disclosed in the autopsy report or expert witness designation;

g. He did object to the State's expert offering any testimony with regard to force;

h. He does not remember how many times he met with the Petitioner;

i. He does not recall the Petitioner ever saying that she felt pressured into giving the police a statement;

j. He does not recall the Petitioner ever saying that the statement she gave to the police was not true;

k. He retained Dr. Bernard Lewis to perform forensic examinations of the Petitioner;

l. Dr. Lewis offered opinions related to the voluntariness of the Petitioner's statement to police as well as the Petitioner's intent and criminal responsibility;

m. He investigated the circumstances surrounding the statement by speaking with the Petitioner; by reviewing the discovery, including the statements and narratives of the officers concerning the taking of the statement; and by obtaining an evaluation regarding the Petitioner's level of functioning and susceptibility by Dr. Lewis;

n. He did not believe there were any sufficient grounds to challenge the Petitioner's recorded statement;

o. His major argument at trial was concerning the Petitioner's specific intent to commit the crimes charged;

6

p. He argued over semantics with the Judge concerning the word "intentional" with regard to the Petitioner's intentional act of tossing of the child versus whether the Petitioner had malicious intent to harm the child by her actions;

q. The parties briefed the issue of whether child neglect was a lesser included offense of child abuse, and he argued that the trial court give an instruction to the jury concerning child neglect, but the court ultimately denied his motion;

r. He did not object to the prosecutor's use of a photograph of the child in closing, as it had been admitted into evidence and earlier published to the jury;

s. He discussed the issue concerning juror Perkey with the Petitioner, and they opted not to strike her as a juror. The Petitioner liked that juror. The juror had a brother that had been convicted of manslaughter, and they believed she might be sympathetic to the Petitioner;

t. He has been practicing criminal law for 32 years;

u. He has extensive trial experience in all manner of criminal cases, including a number of murder cases;

v. In his evaluation of the Petitioner, Dr. Lewis reviewed all of the discovery in the case, including the statements of the Petitioner; he and Dr. Lewis met with the Petitioner separately and together; and Dr. Lewis performed various diagnostic tests on the Petitioner;

w. Dr. Lewis specifically talked to the Petitioner about her statement;

x. He specifically talked to the Petitioner about her statement;

y. He does not recall the Petitioner ever stating that her statement was coerced or false;

7

z. He does not recall Dr. Lewis ever stating that the Petitioner told him her statement was coerced or false;

aa. He cannot imagine that he would have chosen not to challenge the statement if the Petitioner had in any way indicated that her statement was coerced or false; and

bb. Despite the Petitioner's current counsel's assertions, the police officers did not threaten or even bring up going to jail with the Petitioner during her interview. The Petitioner herself brought up going to jail.

[Transcript, 3/7/17, pg. 18-139.]

17. On March 7, 2017, the Petitioner testified in pertinent part as follows:

a. She is the same Monica Boggs who was charged, convicted, and is now serving a sentence in the penitentiary for the crimes being discussed;

b. She understands the purpose of these proceedings;

c. She told Mr. Manford on multiple occasions (as many as five or six times) that the statement she gave to the State Police was coerced and not true;

d. She was under a lot of stress when she spoke to the police after the passing of her son; she felt threatened or coerced (although she did not say why she felt that way); she did not feel that she was free to leave (although she did not say why she felt that way); and she had not slept "for days before that because" her son "was teething."

e. She told Dr. Lewis that the statement she gave to the State Police was coerced and not true.

[Transcript, 3/7/17, pg. 140-145.]

8

18. On June 2, 2017, the Petitioner called Sgt. David E. Boober of the West Virginia State Police who testified in pertinent part as follows:

    a. Sgt. Boober is employed with the West Virginia State Police and has been so employed for the last 24 years;

    b. He has had different responsibilities throughout his career including road trooper, a criminal investigator, a detachment commander, and an investigator with the Crimes Against Children Unit for approximately 8 to 10 years. For the last 5 to 6 years, he has served primarily as a forensic analyst;

    c. Because of how long ago this investigation was, he had to review his prior narratives/actions taken, and transcripts from the file and record to bring himself back up to speed;

    d. Trooper Bowman was the investigating officer in this matter, and he reached out to Sgt. Boober while Sgt. Boober was out of town to ask for assistance.

    e. Sgt. Boober picked up evidence related to the autopsy of the deceased infant victim in Morgantown and brought that evidence back to Trooper Bowman;

    f. Once the findings were obtained from the medical examiner's office, the possible explanations for the child's death given by the family were clearly not consistent with the medical evidence;

    g. Because the cause of death was blunt force trauma, officers wanted to discuss with the family everyone who had contact with or access to the child leading up to the child's death;

9

h. When discussing who would interview who, it was decided that Sgt. Boober would interview the Petitioner, and Trooper Bowman would interview the Petitioner's boyfriend, Mr. Hicks;

i. As an investigating officer, Sgt. Boober always wanted to do the "main interview" himself;

j. The family was asked to voluntarily come into the State Police barracks for follow-up interviews;

k. The Petitioner appeared voluntarily, arranging for her own transportation and accompanied by her boyfriend and family;

l. Sgt. Boober was not dressed in uniform during the interview;

m. The only persons in the interview room during the taking of the statement were the Petitioner, Sgt. Boober, and Sgt. Pansch;

n. Sgt. Pansch was also not in uniform;

o. There was no video recording of the Petitioner's interview as far as he is aware;

p. Although the Petitioner was not under arrest or taken into custody, Sgt. Boober Mirandized her and performed the pre-interview assessment with her indicated on the Miranda rights form, which included information about her age and education level;

q. He informed the Petitioner that she was not under arrest and was free to leave;

r. The Petitioner initialed each line of the form, expressly signaling to Sgt. Boober her understanding of the reason for the interview, the fact that she was

10

not under arrest and free to leave, and that she understood each of the Miranda rights that were read to her;

s. The Petitioner further signed and dated the Miranda rights form again signifying her understanding and waiver of rights;

t. Sgt. Pansch was not in the room with Sgt. Boober and the Petitioner during the entirety of the interview. He was in and out of the room, also communicating with and gathering information from Trooper Bowman and Robert Hicks;

u. The Petitioner expressed a concern over going to jail during the interview, but that was not brought up by the officers;

v. Although the Petitioner made incriminating statements that were consistent with the manner of injury to the child, her timeline concerning when those incidents of injury occurred did not make sense at first;

w. Upon further interview, the Petitioner corrected the timeline of events concerning what day the bottle injury occurred and what day the piano injury occurred;

x. He believed that the Petitioner was being truthful in her statement of what occurred to cause the injuries to the child;

y. Sgt. Boober conceded that the Petitioner could have been placed under arrest following the first part of the recorded statement, and that he did not know what he would have done had the Petitioner attempted to leave at that point in the interview;

11

z. Sgt. Boober had never seen the "interview notes" plan of interviewing the Petitioner and Robert Hicks before this hearing, and he had never spoken to anyone about formulating that plan;

aa. The Petitioner was never handcuffed or restrained when she came to the State Police barracks prior to her interview;

bb. At no point during the interview did Sgt. Boober or Sgt. Pansch threaten the Petitioner in any way;

cc. The initial line of questioning for the Petitioner involved background information, who lived in the household with the child, who may have babysat the child, who had access to the child, etc.;

dd. In cases like these, most of the time the mother's boyfriend is the main suspect and not the mother;

ee. The officers began to record the Petitioner's statement only after she began to disclose incriminating information;

ff. At no time did the Petitioner express that she did not understand what she was being asked or explained;

gg. The Petitioner answered questions and engaged in conversation that indicated to the officers she had a full understanding of the questions being asked;

hh. Following the interviews, the Petitioner was allowed to talk with her family and Mr. Hicks, during which time the Petitioner also told them what she had done;

12

ii. At no time did the officers suggest that the Petitioner tossed or threw the child and at no time did the officers discuss a toy piano. All of that information came directly from the Petitioner;

jj. The Petitioner was asked to demonstrate to officers what she meant by toss or throw, and the Petitioner gestured as to what she meant;

kk. The Petitioner indicated to officers more than once that this toss or throw was "pretty hard;" and

ll. His memory of these matters was better during prior instances of his testimony.

[Transcript, 6/2/17, pg. 7-95.]

19. On June 2, 2017, the Petitioner called Sgt. Kevin R. Pansch of the West Virginia State Police who testified in pertinent part as follows:

a. He is employed by the West Virginia State Police and has been so employed for the last 25 years;

b. He has been with the Bureau for Criminal Investigations since 2001, primarily as a polygraph examiner;

c. He was contacted to respond to the Martinsburg detachment to assist then Senior Trooper Bowman with this infant death investigation;

d. He was consulted in case it became necessary or helpful to administer a polygraph examination during the course of interviews;

e. Sgt. Pansch had never seen the "interview notes" plan of interviewing the Petitioner and Robert Hicks before this hearing, and he had never spoken to anyone about formulating that plan;

13

f. He went back and forth between observing the Petitioner's interview with Sgt. Boober and Mr. Hick's interview with Trooper Bowman; and

g. The Petitioner never asked questions or responded to any questions that he observed that would indicate a lack of understanding on her part.

[Transcript 6/2/17, 101-140.]

20. On September 20, 2017, the Petitioner called Harry A. Smith, III, who testified in pertinent part as follows:

a. He is a practicing attorney with the firm of McNeer, Highland, McMunn, and Varner;

b. He has extensive criminal law experience over his 40-year career;

c. He has twice previously been qualified as an expert witness in the area of criminal defense and criminal trials;

d. He was engaged to review the facts and circumstances in the underlying case;

e. He prepared a written letter directed to Mr. McDermott outlining his opinions in this matter;

f. He opined that a reasonable attorney would have filed a motion to suppress the Petitioner's statement;

g. He opined that nothing could be gained by not challenging the statement of the Petitioner and that there would have been no prejudice suffered by the Petitioner by the filing of the motion and the holding of a hearing;

h. He further opined that there was error in the failure to request a Vance instruction;

14

i. He opined that based upon the alleged errors with regard to the Petitioner's statement, there is a "reasonable possibility" of a different outcome;

j. He opined that Mr. Manford erred in not objecting to the Medical Examiner's testimony that was offered as to matters outside of her report with regard to force and infant versus adult skulls;

k. He further opined that Mr. Manford should have obtained an expert forensic pathologist to combat the Medical Examiner's testimony concerning force;

l. He further opined that it was error for Mr. Manford to have asked the Medical Examiner if her testimony was to a reasonable degree of medical certainty rather than forcing the State to ask the question;

m. He opined that Mr. Manford conceded the defense of neglect in acknowledging that the Petitioner committed an intentional act during Rule 29 argument;

n. He further opined that Mr. Manford's failure to voir dire Juror Perkey was error;

o. He summarily opined that Mr. Manford's representation of the Petitioner at trial had been deficient and there is a reasonable probability the deficiencies may have affected the outcome of the trial;

p. He did not speak with Mr. Manford in his review of the case;

q. He did not speak with Dr. Lewis in his review of the case;

r. He did not speak with the Petitioner prior to her conviction;

s. He was not present for any conversations or meetings between Mr. Manford and the Petitioner; and

15

     t.  His testimony and opinion come with the benefit of hindsight.

[Transcript, 9/20/17, pg. 5-57.]

21. On September 20, 2017, the Petitioner called Ariel Doyle, who testified in pertinent part as follows:

     a.  She has been a friend of the Petitioner since kindergarten;

     b.  She and the Petitioner grew up together;

     c.  She and the Petitioner are very close friends;

     d.  Growing up, the Petitioner was always looking for acceptance from her peers;

     e.  The Petitioner experienced some academic difficulties but worked hard and made it through school;

     f.  The Petitioner sometimes has a hard time articulating what it is she wants to say; and

     g.  The Petitioner told her the police did things to her to get her to confess to something she did not do.

[Transcript, 9/20/17, pg. 58-67.]

22. On September 20, 2017, the Respondent called B. Craig Manford, Esq., who testified in pertinent part as follows:

     a.  He stated that if the Petitioner had told him multiple times that she felt the police coerced her statement, he would have filed a suppression motion;

     b.  If the Petitioner had told Dr. Lewis, who had been retained in part to give an opinion as to her state of mind during the statement, Dr. Lewis would have included that in his report; and

     c.  He did not believe the Petitioner's statement was coerced or false.

16

[Transcript, 9/20/17, pg. 69-75.]

23. Following the close of all evidence, the Court ordered the parties to submit proposed final orders to the Court for consideration.

## CONCLUSIONS OF LAW

1. A habeas corpus procedure is "civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case." State ex rel. Harrison v. Coiner, 154 W.Va. 467, 176 S.E.2d 677 (1970); W. Va. Code § 53-4A-1(a).

2. A convicted criminal has the right to one omnibus post-conviction habeas proceeding. The West Virginia Supreme Court of Appeals holds:

> In general, the post-conviction habeas corpus statute...contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal to this Court, and one omnibus post-conviction hearing at which he may raise any collateral issues which have not previously been fully and fairly litigated.

Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606, 609 (1981).

3. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed. Syl. Pt. 4, State ex rel. McMannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979), cert. den., 464 U.S. 831 (1983)." Syl. Pt. 9, State ex rel. Azeez v. Mangum, 195 W. Va. 163, 465 S.E.2d 163 (1995); Syl. Pt., State ex rel. Phillips v. Legursky, 187 W. Va. 607, 420 S.E.2d 743 (1992).

4. Moreover, "[t]here is a strong presumption in favor of the regularity of court proceedings and the burden is on the person who alleges irregularity to show affirmatively that such irregularity existed." Syl. Pt. 2, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486

17

(1966); State ex rel. Massey v. Boles, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, 148 W. Va. 13, 132 S.E.2d 634 (1963).

5. Due to this strong presumption of regularity, statutory law requires that a petition for writ of habeas corpus ad subjiciendum shall "specifically set forth the contention or contentions and grounds in fact or law in support thereof upon which the petition is based[.]" W. Va. Code § 53-4A-2.

6. The reviewing court shall refuse, by written order, to grant a writ of habeas corpus if the petition, along with the record from the proceeding resulting in the conviction and the record from any proceeding wherein the petitioner sought relief from the conviction show that the petitioner is entitled to no relief or that the contentions have been previously adjudicated or waived. W. Va. Code § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, 215 W.Va. 729, 601 S.E.2d 49, 54 (2004); Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979).

7. In order to prevail on an issue previously adjudicated during the criminal proceeding, the petitioner must prove that the trial court's ruling is "clearly wrong". W. Va. Code § 53-4A-1(b).

8. Grounds not raised by a petitioner in his petition are waived. Losh v. McKenzie, 166 W. Va. 762, 277 S.E.2d 606, 612 (1981); see also: State ex rel. Farmer v. Trent, 206 W. Va. 231, 523 S.E.2d 547 (1999), at 550, n. 9.

9. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 and 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

18

10. The reviewing court has a mandatory statutory duty to enter an order denying the relief requested in a habeas petition if the record demonstrates that a habeas petitioner is entitled to no relief. That statute reads, in part:

> If the petition, affidavits, exhibits, records and other documentary evidence attached thereto, or the return or other pleadings, or the record in the proceedings which resulted in the conviction and sentence, or the record or records in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or the record or records in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, show to the satisfaction of the court that the petitioner is entitled to no relief, or that the contention or contentions and grounds (in fact or law) advanced have been previously and finally adjudicated or waived, the court shall enter an order denying the relief sought.

W. Va. Code § 53-4A-7(a); *see also* W. Va. Code § 53-4A-3(a) and Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979).

11. When denying or granting relief in a habeas corpus proceeding, the court must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. State ex rel. Watson v. Hill, 200 W. Va. 201, 488 S.E.2d 476 (1997).

## Ineffective Assistance of Counsel

12. The West Virginia Supreme Court of Appeals reiterated the standards necessary to prove ineffective assistance of counsel:

> 1. In West Virginia Courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.E.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Syl. Pt. 5, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).

19

2. In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. Syl. Pt. 6, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).

3. Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused. Syl. Pt. 21, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

4. One who charges on appeal that his trial counsel was ineffective and that such resulted in his conviction, one must prove the allegation by a preponderance of the evidence. Syl. Pt. 22, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974)."

Syl Pts. 1-4, State ex rel Kitchen v. Painter, 226 W.Va. 278, 700 S.E.2d 489 (2010).

### Statement of the Petitioner

13. The Petitioner argues that trial counsel was ineffective for failing to challenge the voluntariness of her statements to law enforcement and for failing to request a Vance instruction be given to the jury; however, the Petitioner fails to state what legal basis she had to challenge her statements. She makes a blanket statement regarding police coercion.

14.

> The burden is on the State to prove by a preponderance of the evidence that extrajudicial inculpatory statements were made voluntarily before the statements can be admitted into evidence against one charged with or suspected of the commission of a crime.

Syl. Pt. 1, State v. Bradshaw, 193 W. Va. 519, 457 S.E.2d 456 (1995). "Whether an extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be

20

determined from a review of the totality of the circumstances." Syl. Pt. 2, State v. Bradshaw, 193 W. Va. 519, 457 S.E.2d 456 (1995).

15. The Petitioner initially spoke to Trooper Bowman shortly after her son died. Because it was an infant death, police were contacted as a matter of course. Trooper Bowman had an initial conversation with the family concerning the death of the infant with no information as to whether the child's death involved a crime at all or merely resulted from natural causes.

16. The recorded statement(s) of the Petitioner at issue were taken within the next day after the release of preliminary information by the Medical Examiner's office to the State Police that the infant's cause of death was non-accidental blunt force trauma.

17. The Petitioner's statements were non-custodial. She was requested by telephone to come to the State Police Barracks for further interview. She came voluntarily by way of her own transportation, accompanied by her boyfriend and family member. She was not handcuffed or physically restrained by officers upon her arrival. She was informed that she was not under arrest or in custody and was free to leave at any time.

18. The Petitioner was still Mirandized by officers as a precautionary measure, and she and made a written waiver of her Miranda rights.

19. Officers explained that the beginning of their conversation with the Petitioner was unrecorded because they were gathering background information concerning the members of the household, who may have had access to the child leading up to his death, if anything out of the ordinary had happened recently, etc. Once the Petitioner began making incriminating statements, the officers took a recorded statement from the Petitioner.

20. Because these statements were recorded, the interactions between the

21

Petitioner and officers were memorialized in real time. A review of these recordings reveal facts consistent with the officers' testimony that the Petitioner was lucid and coherent, answered questions in an intelligent manner, and was a willing participant in the interview. The recording also corroborates the testimony of trial counsel and the officers that the Petitioner herself brought up her fear of going to jail. This was not a threat made by the officers.

21. There is no evidence that suggests there was police coercion.

22. The Petitioner was evaluated by an expert whom she hired, in part, to assess her mental status and susceptibility with regard to the giving of her statements. The Petitioner's own retained expert concluded, taking into account his interview with her, circumstancial factors such as stress, grief, and lack of sleep, and the results of his diagnostic testing of her intellect and personality, that the Petitioner had the ability at the time of the giving of her statement to do so knowingly and voluntarily. There has been no evidence offered to contradict this opinion.

23. The Court finds the Petitioner's testimony that she told Mr. Manford and Dr. Lewis- her own retained counsel and her own retained expert- on multiple occasions that her statements were coerced and untrue to be wholly uncredible. Had she done so, Mr. Manford, being an attorney with his years and wealth of experience, would have filed a motion to suppress the Petitioner's statement; furthermore, Dr. Lewis, an expert who had been retained to review and discuss the Petitioner's interviews with her, would have surely included that in his report when opining as to the Petitioner's mental and psychological ability to give a knowing and voluntary statement on the evening in question.

24. There is no credible evidence suggesting that the Petitioner's statments were not knowingly and voluntarily made.

25. In the Petitioner's statements, she describes how she caused the injuries to the infant.

22

The actions she describes matches the physical evidence in the case. The Petitioner states that the bruise on the child's face was caused by a bottle the Petitioner had thrown striking the child. The Petitioner states that the skull fractures were caused by a single incident wherein she tossed or threw the infant into his crib, striking the back of his head on a toy piano. She describes hearing the sound of his head striking the object. Although the Medical Exminer's report indicates there was more than one skull fracture, which was typically indicative of more than one impact, the Medical Examiner testified at trial that a single blow to the head on an object with multiple protruding parts like the toy piano in this case could have caused both fractures. After the Petitioner made these statements, officers were able to recover a toy paino, just as the Petitioner had described, from the home.

26. Following her statement to the police, the Petitioner told her boyfriend and family member the same version of events when describing what she did to her son.

27. During her evaluation by Dr. Lewis, the Petitioner told him the same version of events when describing what she did to her son.

28. There is no credible evidence that the Petitioner's statements were false or untrue.

29. Despite the opinion of Mr. Smith that not filing a motion to suppress the statement of the Petitioner was ineffective, the Court's thorough review of this issue reveals that trial counsel's motion to suppress, just as he set forth on the record at the pre-trial hearing in the underlying case, would have been frivolous.

30. Based upon the above factors, the Petitioner fails to demonstrate that trial counsel was objectively unreasonable for failing to file a frivolous motion. State v. Miller, supra; Strickland v. Washington, supra; State ex rel. Kitchen v. Painter, supra.

31. Furthermore, even if conventional wisdom dictated trial counsel should have filed the

23

motion- fruitful or not- the evidence before the Court is clear that the motion would not have been successful. Therefore, there is no reasonable probability that the result would have been different had a full suppression hearing been held pre-trial and an additional instruction been given to the jury. State v. Miller, *supra*; Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

## Expert Testimony

32. Petitioner alleges three errors with regard to the introduction of expert testimony. Two of those allegations are that trial counsel failed to object to the medical examiner's testimony regarding force and that trial counsel should not have asked the medical examiner if her opinions were to a reasonable degree of medical or scientific certainty. The true crux of the Petitioner's argument with regard to expert testimony, however, is that trial counsel was ineffective for failing to hire an additional expert witness to combat the testimony of the medical examiner, Dr. Martina Schmidt, who performed the autopsy on the infant. To that end, the Petitioner presented the report of Dr. William Hauda who reviewed the materials in the underlying felony and the trial testimony of Dr. Schmidt.

33. Trial counsel testified that he consulted a forensic nurse to review the medical examiner's report with him so that he could decide if there was any reason to retain a forensic pathologist for purposes of trial. After reviewing the same with the forensic nurse and in consideration of the expert witness designation of the medical examiner, Mr. Manford chose not to seek an expert for purposes of trial.

34. Furthermore, the record indicates that trial counsel did object to the line of questioning of the State concerning what amount of force it would take to break an infant's skull. [Tr., 9/2/09, pg. 33-34.] However, the State clearly provided notice that Dr. Schmidt would

24

testify about the contents and photographs of her autopsy findings and may testify about the difference between adult and child bone structure in the skull. [Designation of Expert, 8/28/09.] As such, the Court overruled that objection.

35. When asked by the State if she had any idea how much force it would take to break an infant's skull, Dr. Schmidt testified, "No, I can't testify to how much force was used." When asked if it would take more force to break a child's skull bone or an adult's, she responded that, in her opinion, it would take more force to break a child's. She reiterated thereafter that she did not know how much force it would take. [Tr. 9/2/09, 33-34, 34-82.] Dr. Schmidt never testified about how much force it would take to break a either a child's or an adult's skull because, as she candidly admitted, she did not know.

36. The Petitioner's expert herein, Dr. Hauda, states that it is his opinion it takes more force to fracture an adult skull than that of an infant and states that Dr. Schmidt's opinion fails to take into consideration the complexity of the skull under stress. [Dr. Hauda report, pg. 4.] Dr. Hauda also does not offer an opinion as to how much force it would take to break either an infant or adult skull. [Dr. Hauda's report, *passim.*]

37. Also in his report, Dr. Hauda offers that falls from being seated on the floor would not be expected to have enough force for this type of injury. [Dr. Hauda's report, pg. 7.] He then offers that "skull fractures may occur...with falls from a caregiver's arms, particularly if the fall occurs during movement of the caregiver imparting additional velocity to the infant." [Id.] This opinion does not materially differ from that of Dr. Schmidt. Dr. Schmidt testifies that an infant could generate enough force on his own to cause a skull fracture if he fell from "a great height" but states it is unlikely that he would have caused such an injury on his own from merely crawling around or bumping into a wall. [Tr. 9/2/09, pg. 73, 77.] Dr. Schmidt, like Dr. Hauda,

25

states that the skull fracture would have required some force, but neither doctor discusses the degree or amount of force that would be required. [Tr. 9/2/09, pg. 82.]

38. Dr. Schmidt further conceded, as Dr. Hauda states in his report, that although Dr. Schmidt indicated in her autopsy report that there were two blows to the back of the infant's head based upon the two contusions present, the fracture could have been caused by a single blow given the explanation of the toy piano. Dr. Schmidt indicated that she did not have information concerning the toy piano in performing the autopsy or issuing her report but stated that a single blow on such an object could be consistent with the two contusions and fracture present. [Tr. 9/2/09, pg. 58-60, 78-79.]

39. In sum, the only opinion Dr. Hauda offers in contradiction to that of Dr. Schmidt is whether it would take more force to fracture the skull of an infant or an adult. This distinction would have no practical material impact on the jury's decision with neither expert offering any opinion as to the actual amount of force it would take to break either skull. Both opine that it would have taken force to break the infant's skull. As a layperson, that is the opinion that is relevant and material- not whether it theoretically would have taken more or less force to break someone else's skull. As such, Dr. Hauda's report provides no substantive support for the Petitioner's claim of ineffective assistance of Petitioner's defense counsel.

40. Trial counsel was able to get Dr. Schmidt to concede that the injuries to the child were consistent with the Petitioner's explanation thereof. [Tr. 9/2/09, pg. 58-60, 78-79.]

41. Trial counsel was also able to get Dr. Schmidt to agree that typical symptoms exhibited by an infant with a subdural hemorrhage would be similar to ordinary symptoms exhibited by an infant with a cold and/or an infant who is teething. [Tr. 9/2/09, pg. 61-69, 80-81.]

26

42. Not to be overlooked with regard to the consideration of the medical evidence concerning force, is the Petitioner's own statement given to law enforcement that she threw the infant into the crib "pretty hard," so there was not a great deal of controversy surrounding whether or not there was *some* force involved. The Petitioner's defense was based upon her state of mind, intent, and lack of malice. The actions of the Petitioner were less in question than her intentions.

43. Defense counsel's cross examination of the expert witness was wholly competent and allowed him to argue the Petitioner's position that the injuries to her child were not inflicted with malicious intent. Strickland v. Washington, *supra*; State v. Miller, *supra*; State v. Thomas, *supra*; State ex rel. Kitchen v. Painter, *supra*.

44. Based upon the above, the Petitioner fails to show that her counsel's performance fell below an objective standard of reasonableness. Strickland v. Washington, *supra*; State v. Miller, *supra*; State v. Thomas, *supra*; State ex rel. Kitchen v. Painter, *supra*.

45. Furthermore, even with the addition of the facts contained in Dr. Hauda's report, the Petitioner fails to show that the outcome of the proceeding would have been different but for the actions and decisions of her counsel. State v. Miller, *supra*; Strickland v. Washington, *supra*; State v. Thomas, *supra*; State ex rel. Kitchen v. Painter, *supra*.

46. Lastly, the Court finds no error in trial counsel inquiring of the medical examiner if her offered opinions were held to a reasonable degree of medical or scientific certainty. The record is clear that if Petitioner's counsel had not asked, the Court was going to allow the prosecutor to ask the same question.

### Juror

47. At the beginning of day two of the jury trial, a juror had taken the bailiff aside and

27

reported that after Petitioner's counsel had shown a scrapbook to the jury that the Petitioner had kept of her son's life, the juror recognized a photograph of the biological father of the deceased child as someone she knew growing up. The juror had reported to the bailiff that it would not affect her ability to be an impartial juror, but the juror did not want to hide this from the Court. [Tr. 9/2/09, pg. 4-7.]

48. The Court addressed the parties with the issue. The Petitioner was present. Both parties decided to rely on prior individual voir dire of this juror, did not believe that it would affect the outcome of the trial, and did not believe that further voir dire would be necessary. The Petitioner's counsel confirmed to the Court that he had fully discussed the issue with the Petitioner and that the Petitioner had no objection to the continued service of this juror. [Tr., 9/2/09, pg. 4-7.]

49. Trial counsel testified in more detail as to this discussion at the omnibus hearing. He stated that the Petitioner specifically liked that juror because the juror had a family member who had been convicted of manslaughter. It was for that reason the Petitioner believed the juror may be sympathetic to her case.

50. The Petitioner cites a long litany of case law concerning the meaning of juror bias and the obvious importance of securing an impartial jury. However, the Petitioner makes no real argument as to how this juror could have been biased or prejudiced for or against the Petitioner.

51. The record in the case demonstrates that the infant's biological father had not been involved in the child's life at all. He was not around the child and had no contact with the child. He was, therefore, never a suspect in the case and was not even so much as a potential witness in the case. The only way his identity was even disclosed was through the presentation of a

28

scrapbook the Petitioner had begun for her son, which contained a picture of the biological father. In practical terms, the infant's biological father had no relevance to the case whatsoever.

52. Considering the above, the fact that the parties had conducted individual voir dire of this juror prior to trial, and the juror's statements that she could and would continue to be fair and impartial in hearing and deciding the facts of the case, the Petitioner agreed to proceed with this juror on the panel. [Tr., 9/1/09, pg. 92-99, Tr., 9/2/09, pg. 4-7.] Trial counsel indicated that he had discussed the issue and all of the options with the Petitioner and that it was their desire to continue with the trial. [Tr., 9/2/09, pg. 4-7.]

53. Additionally, deference is accorded to the trial court in jury selection because "[t]he trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions; therefore, its assessment is entitled to great weight." Id., 476 S.E.2d at 553 (citing State v. Phillips, 194 W. Va. 569, 590, 461 S.E.2d 75, 96 (1995) ("[g]iving deference to the trial court's determination, because it was able to observe the prospective jurors' demeanor and assess their credibility, it would be most difficult for us to state conclusively on this record that the trial court abused its discretion"). The trial court, having been able to judge the juror's demeanor during the previous day's voir dire and during the trial proceedings, likewise foresaw no legal reason to remove this juror.

54. Based upon the above, the Petitioner fails to demonstrate that the actions of trial counsel in this regard were objectively unreasonable. Furthermore, the Petitioner offers no evidence to show that the outcome of the proceedings would have been different had he insisted that the juror be subject to additional voir dire or that he insisted the juror be removed from the case and an alternate appointed in her place. State v. Miller, supra; Strickland v. Washington, supra; State ex rel. Kitchen v. Painter, supra.

29

## Closing Argument

55. The Petitioner concedes that trial counsel properly brought before the Court pretrial issues related to the use of autopsy photographs and concedes that the Court utilized proper procedure in admitting certain relevant photographs copied in black and white during the course of the trial.

56. It was wholly appropriate for the State to refer in its closing to the evidence that was admitted at trial.

57. The West Virginia Supreme Court holds that:

> The purpose of closing arguments is not only to summarize the evidence, but to afford counsel the opportunity to persuade jurors, within acceptable boundaries, to view the evidence in the light most favorable to their client. Thus, advocates are given great latitude in arguing their cases but are also required to "keep within the evidence and not make statements calculated to inflame the minds of jurors intending to induce verdicts warped by prejudice [.] State v. Kennedy, 162 W.Va. at 249, 249 S.E.2d at 191 (1978) (*quoting* State v. Lohm, 97 W.Va. 652, 663, 125 S.E. 758, 762 (1924)).

Smith v. Andreini, *supra*, 223 W.Va. 605, 678 S.E.2d 858, 869 (2009).

58. Closing arguments are not evidence. *See* Perrine v. E.I. du Pont de Nemours and Co., 225 W.Va. 482, 694 S.E.2d 815 (2010).

59. References in closing arguments to evidence admitted at trial do not constitute error. *See* State v. Gilman, 226 W.Va. 453, 702 S.E.2d 276 (2010).

60. Elements of the offense of Death of a Child by a Parent, W. Va. Code § 61-8D-2a(a)[1] include malice and intent to inflict "physical pain, illness or any impairment of

---

[1]W. Va. Code § 61-8D-2a(a) reads: "If any parent, guardian or custodian shall maliciously and intentionally inflict upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical

30

physical condition by other than accidental means." In its closing, the State referenced photos that were admitted into evidence of the child's skull fracture to demonstrate to the jury by the severity of the child's injuries, and the malice and intent of the Petitioner to inflict physical pain and physical impairment on the child. [Tr., 9/3/09, pg. 35-44.]

61. In support of Count Three, charging Gross Child Neglect Causing Substantial Risk of Serious Bodily Injury, in violation of W. Va. Code § 61-8D-4(e)[2], the State also had to demonstrate the element of "gross neglect" by the Petitioner for not seeking medical attention for the injuries she inflicted upon her child. Simple neglect is defined as "the unreasonable failure by a parent, guardian, or any person voluntarily accepting a supervisory role towards a minor child to exercise a minimum degree of care to assure said minor child's physical safety or health." W. Va. Code § 61-8D-1(6). Reference in the State's closing to the severity of the child's injuries were wholly germane to establishing the elevated element of "gross" neglect of the child.

62. Trial counsel had no objection to the State's closing because the use of photographs that were admitted as evidence to demonstrate the necessary elements of the charged offenses was wholly proper.

63. As such, the Petitioner fails to prove that her trial counsel's performance fell below

---

condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian shall be guilty of a felony."

[2]W. Va. Code § 61-8D-4(e) reads in part: "Any person who grossly neglects a child and by the gross neglect creates a substantial risk of serious bodily injury or of death to the child is guilty of a felony[.]"

31

an objective standard of reasonableness for not objecting to the use of the photographs. Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

64. Additionally, the Petitioner does not show that her rights were prejudiced had there been an objection; therefore, there has been no showing that if counsel had objected, the results of the proceeding would have been different . Smith v. Andreini, *supra*; State v. Miller, *supra*; Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

## Jury Instructions

65. Trial counsel never waived the right to argue that a more appropriate finding for the jury to make would be one of neglect, nor did trial counsel leave the Petitioner without any theory of defense to present to the jury.

66. The Petitioner's theory of the case, based upon the totality of the evidence, was that she did not have the malicious intent necessary for a conviction under W.Va. Code § 61-8D-2a, Death of a Child by a Parent. Further, defense counsel argued to the Court that an instruction should be given for Child Neglect by a Parent Resulting in Death pursuant to W.Va. Code § 61-8D-4a, arguing that it was a lesser included offense of Death of a Child by a Parent.

67. The Court had the parties file briefs regarding whether or not Child Neglect by a Parent Resulting in Death was in fact a lesser included offense of Death of a Child by a Parent.

68. After briefing and extensive argument, the Court made detailed findings of fact and conclusions of law denying the Petitioner's instruction, finding that Child Neglect by a Parent Resulting in Death was not a lesser included offense of Death of a Child by a Parent as charged in Count One. Further, the Court also found, based upon the evidence adduced at trial, that there was no factual basis for an instruction on neglect given the statements of the Petitioner. [Memorandum in Support of Defendant's Motion to Instruct the Jury Upon the Lesser Included Offense of Child Neglect by a Parent Resulting in Death, 9/3/09, Tr., 9/2/09, pg. 334-341, Tr., 9/3/09, pg. 2-16.]

69. Petitioner implies that the sole theory of her case below was that she was neglectful and not malicious; however, the evidence adduced at trial made it clear the Petitioner stated she threw or tossed the baby and not that the baby merely slipped out of her grasp. The evidence established that the Petitioner clearly meant to throw the baby, so it was unquestionably an

33

intentional act in that sense. The issue was what her state of mind- her specific intent- was at the time. Hence, her trial counsel argued that her actions were not malicious or done with the intent to harm the child in any way, which was the most objectively reasonable argument he could have made under the circumstances.

70. Even despite the aforementioned obstacles, trial counsel wrote a six-page memorandum of law to the Court arguing that Child Neglect by a Parent Resulting in Death was a lesser included offense of Death of a Child by a Parent as charged in Count One of the indictment, and asking the Court to give that instruction to the jury. Counsel clearly did everything he could to advance Petitioner's theory of the case.

71. The Petitioner fails to show that counsel's performance in arguing for jury instructions fell below an objective standard of reasonableness. By all accounts, defense counsel zealously argued and briefed the Court on the issues presented and the Court simply decided against those arguments based upon the facts and the law. The Petitioner also fails to show that counsel committed any errors adversely affecting the outcome of the case in the course of his arguments regarding jury instructions. State v. Miller, *supra*; Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

## Change of Venue

72.     To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused. Syllabus Point 2, State v. Wooldridge, 129 W.Va. 448, 40 S.E.2d 899 (1946). Syllabus Point 1, State v. Sette, 161 W.Va. 384, 242 S.E.2d 464 (1978).

34

Syl. Pt. 1, State v. Derr, 192 W. Va. 165, 451 S.E.2d 731 (1994).

> 73. One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

Syl. Pt. 3, State v. Derr, 192 W. Va. 165, 451 S.E.2d 731 (1994).

> 74. In other words,

> > Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial. Syllabus Point 1, State v. Gangwer, W.Va., 286 S.E.2d 389 (1982).

Syl. Pt. 2, State v. Young, 173 W. Va. 1, 311 S.E.2d 118 (1983).

75. The Petitioner has failed to show there was any basis for trial counsel to have made a motion for a change of venue, considering the burden rests on the Petitioner to show good cause for the change-- not just that there was pretrial publicity, but that the community was so prejudiced against the Petitioner and that their opinions were so fixed that the Petitioner could not get a fair trial. State v. Derr, supra; State v. Young, supra.

76. While the Petitioner cites a dozen articles that appeared in local newspapers on the Petitioner's case prior to the start of trial, the Petitioner fails to mention that these few articles spanned a period of over two (2) years beginning with the death of the child.

77. Further, the parties agreed to call additional jurors in for the selection process than they would normally based upon both the nature of the case and the possibility of jurors having heard or read news coverage related to the case. [Tr., 8/10/09, pg. 20-21.]

78. The Court conducted extensive voir dire with the potential jurors and allowed the

parties to ask additional questions of them in individual voir dire. [Tr., 9/1/09, pg. 3-257.] The parties were able to agree that a qualified pool of 20 jurors had been assembled for them to make their strikes. [Tr., 9/1/09, pg. 245.]

79. There was no indication that any juror was influenced by any pretrial publicity. There was no indication of an overriding influence of any media coverage on members of the pool. There was no indication that the Court was having problems seating a jury.

80. Based upon the above, the Petitioner has failed to demonstrate that counsel was objectively unreasonable in not moving for a change of venue when he had little facts to present to the Court as a basis therefor. Additionally, the Petitioner has failed to demonstrate that had counsel moved for a change of venue, the result of the proceedings would have been different. State v. Miller, *supra*; Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

### Subpoenaing of Witnesses

81. The Petitioner alleges that her counsel was ineffective for failing to subpoena or call certain witnesses for her case. All of the witnesses cited by the Petitioner under this heading were not factual witnesses present during any of the events surrounding or leading up to the death of the infant. The Petitioner indicates that all of the witnesses cited are family members of the Petitioner who would have taken the stand to say that the Petitioner was a good parent and was good at caring for other children.

82. Trial counsel called the Petitioner's mother, three brothers, boyfriend, and a neighbor to the stand to testify concerning those exact same things. Calling four more witnesses, all family members of the Petitioner, to testify identically to the numerous witnesses already called

36

would have added little to the case and may have drawn objection from the State as being cumulative.

83. Furthermore, the calling of witnesses is in that category of representation arising from occurrences involving strategy, tactics, and arguable courses of action that should not generally be second-guessed by a reviewing court. State v. Miller, *supra;* State v. Thomas, *supra.*

84. Based upon the above, the Petitioner fails to show that her counsel's performance in this regard fell below an objective standard of reasonableness or that had counsel called any one or all of these witnesses the outcome of the proceedings would have been different. State v. Miller, *supra;* Strickland v. Washington, *supra;* State ex rel. Kitchen v. Painter, *supra.*

## Questioning of Witnesses

85. The Petitioner argues that her counsel was ineffective for failing to ask witnesses about their observations concerning the Petitioner's care of children; however, a review of the record affirmatively establishes that trial counsel *did* ask witnesses about those very things.

86. Donna Boggs, the Petitioner's mother, testified that the Petitioner took good care of the infant and that "he was her life." [Tr., 9/2/09, pg. 184-217, *207.]

87. Michael Boggs testified that the Petitioner was "great" with the baby, that she loved him, and that she was always carrying him around with her everywhere she went. [Tr., 9/2/09, pg. 227-233, *230.]

88. Robert Hicks, Jr. testified that the Petitioner and the infant had a "wonderful" relationship and that they loved each other very much. He described the way the infant would reach for the Petitioner and cling to her, and he described the way that the Petitioner would care for the infant. [Tr., 9/2/09, pg. 238-292, *241-243.]

37

89. The Petitioner's expert witness, Dr. Bernard Lewis, testified concerning the Petitioner's relationship and bond with the infant and how he positively affected her life and gave her purpose and direction. [Tr., 9/2/09, pg. 297-317, *310-313.]

90. Based on a review of the record, the Petitioner has failed to demonstrate that counsel's performance in the questioning of witnesses was objectively unreasonable or that, but for counsel's alleged inadequate questioning of these witnesses, the outcome of the proceedings would have been different. State v. Miller, supra; Strickland v. Washington, supra; State ex rel. Kitchen v. Painter, supra.

91. Further, the questioning of witnesses is again in that category of representation arising from occurrences involving strategy, tactics and arguable courses of action that should not generally be second-guessed by a reviewing court. State v. Miller, supra., State v. Thomas, supra.

## Investigation of the Case

92. The Petitioner presented numerous witnesses at trial who had seen and interacted with the infant in the two days prior to his passing. All of them indicated that the baby was behaving simply as though he was teething and/or had a cold and did not notice anything out of the ordinary. Further, Robert Hicks, Jr., who interacted with the baby on the day of his death, testified that the baby slept a lot that day and periodically looked as though he was in a daze.

93. The Petitioner does not assert that any of the evidence that any additional unnamed witnesses would or could have offered was at variance with the testimony and evidence that the Petitioner did offer during the course of the trial.

94. Due to the strong presumption in favor of the regularity of court proceedings and

38

Petitioner's burden to affirmatively show the existence of irregularity, specificity is required in habeas pleadings. W. Va. Code § 53-4A-2; *see also* Syl. Pt. 2, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486 (1966); State ex rel. Massey v. Boles, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, 148 W. Va. 13, 132 S.E.2d 634 (1963).

95. The Petitioner fails to allege any additional, non-cumulative contribution that any witness could have offered.

96. Furthermore, as discussed in previous subsections, the presentation of witnesses is in that category of representation arising from occurrences involving strategy, tactics, and arguable courses of action that should not generally be second-guessed by a reviewing court. State v. Miller, *supra;* State v. Thomas, *supra.*

97. Based on the above, the Petitioner has failed to demonstrate that counsel's performance regarding the investigation and presentation of evidence related to the appearance of the child in the days prior to his death fell below an objective standard of reasonableness or that but for counsel's alleged inadequate performance in this regard, the outcome of the proceedings would have been different. State v. Miller, *supra;* Strickland v. Washington, *supra;* State ex rel. Kitchen v. Painter, *supra.*

### *Continuance*

98. The Petitioner offers no factual basis for her allegation that her counsel was ineffective for failing to request a continuance of her trial based upon his busy schedule aside from the fact that defense counsel had a trial immediately prior to the Petitioner's trial.

99. Furthermore, the Petitioner offers no factual basis to believe that her counsel's busy schedule resulted in a lack of preparedness for her trial.

100. Trial lawyers, especially quality trial lawyers with the upstanding reputation of

39

the Petitioner's trial lawyer, try cases. They try them often. Because of the busy dockets of the courts, sometimes trials fall back-to-back without a great deal of time in between.

101. Trial counsel had been retained and had represented the Petitioner since the inception of her case in August of 2008. There had been numerous hearings in the case. Trial had already been scheduled and rescheduled previously. Trial counsel was abundantly familiar with the facts and nuances of the Petitioner's case by the time the matter came on for trial.

102. The fact that defense counsel had just finished a jury trial at the start of the Petitioner's jury trial does not mean that defense counsel was unprepared or ineffective. Again, specificity is required in habeas pleadings. W. Va. Code § 53-4A-2; *see also* Syl. Pt. 2, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486 (1966); State ex rel. Massey v. Boles, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, 148 W. Va. 13, 132 S.E.2d 634 (1963). The Petitioner simply fails to cite anything in the record of the case that supports this claim.

103. Based upon the above, the Petitioner has failed to demonstrate that counsel was objectively unreasonable in not moving the Court for a continuance. Furthermore, the Petitioner has failed to show that had defense counsel asked for a continuance, the outcome of the proceedings would have been different.[3] State v. Miller, *supra*; Strickland v. Washington, *supra*; State ex rel. Kitchen v. Painter, *supra*.

104. In sum, the Petitioner has failed to meet either prong of the two-prong standard

_____

3 Petitioner's trial counsel did move for a continuance based upon the Petitioner's pregnancy, and that continuance motion was denied. The Petitioner alleges error that additional time for preparation was not specifically included in the motion.

necessary to prove ineffective assistance claims pursuant to Strickland v. Washington, *supra*, State v. Miller, *supra*, and State ex rel. Kitchen v. Painter, *supra*, for each and every allegation contained under this subheading. As such, the Petitioner is not entitled to relief based upon a claim of ineffective assistance of counsel.

## The Petitioner's Statement

105. The Petitioner advanced the argument that her confession was involuntary on direct appeal to the West Virginia Supreme Court. The Court considered this argument and affirmed the conviction and sentence of the Petitioner. As such, this allegation has been previously finally adjudicated. Losh v. McKenzie, *supra*; Ford v. Coiner, *supra*.

106. Furthermore, the Petitioner failed to advance the argument that her confession was false on direct appeal to the Supreme Court. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 and 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

107. 
1. A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence. Syl. Pt. 3, State v. Vance, 162 W.Va. 467, 250 S.E.2d 146 (1978).

3. When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error. Syl. Pt. 1, State v. Lacy, 196 W. Va. 104, 468 S.E.2d 719 (1996).

Syl. Pts. 1 and 3, State v. Jones, 220 W.Va. 214, 640 S.E.2d 564 (2006).

41

108.    In this case, there was no suppression hearing because the Petitioner recognized that her statements given to police were voluntarily given outside of a custodial setting. Despite the fact that Miranda warnings were not required in that non-custodial setting, the Petitioner was informed of her Miranda warnings and knowingly and intelligently waived them in writing. *See* Syl. Pt. 3, State v. Bradshaw, 193 W.Va. 519, 457 S.E.2d 456, *cert. denied* 516 U.S. 872 (1995) ("To the extent that any of our prior cases could be read to allow a defendant to invoke his Miranda rights outside the context of custodial interrogation, the decisions are no longer of precedential value."). At pre-trial, the defense informed the trial court that the Petitioner's recorded statement was transcribed, the Petitioner executed a written Miranda waiver (which execution is reflected in the recorded statement), and the Petitioner was evaluated by a psychologist secured by the defense who reported the Petitioner had the mental and psychological ability at the time of the giving of her statement to give the same freely and knowingly. The defense conceded it had no legal grounds for a challenge to the admissibility of the statement. [Pre-Trial Hearing Order, 10/30/09; Tr., 8/10/09, pg. 3-4.]

109.    The West Virginia Supreme Court of Appeals holds:

> [w]hen there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. Syl. Pt. 8, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995); Syl. Pt. 1, *State v. White*, 223 W.Va. 527, 528, 678 S.E.2d 33, 34 (2009).

Syl. Pt. 1, State v. Day, 225 W.Va. 794, 696 S.E.2d 310 (2010).

110.    Further, the trial court was under no duty to conduct a suppression hearing in light of the Petitioner's waiver of that hearing. The West Virginia Supreme Court has never developed such a rule. In deciding State v. Jenkins, 176 W.Va. 652, 346 S.E.2d 802 (1986), the

42

Supreme Court never held that trial courts must *sua sponte* conduct suppression hearings of a criminal defendant's statements to police.

111. Based upon the record and applicable law, there was no clear error in the trial court's admission of the statements of the Petitioner. State v. Jones, *supra*.

112. Furthermore, as explored above with regard to the Petitioner's claims of ineffective assistance of counsel regarding trial counsel's failure to file a suppression motion, this Court, after review of the underlying record, the testimony offered in this proceeding, and in consideration of applicable law, finds and concludes that the Petitioner's statement would have been ruled admissible if there had been a full suppression hearing held before the trial court. The Court fully incorporates its above conclusions numbered 13-31 herein by reference.

113. Considering the lack of factual support offered in the Petition and based upon the clear record of this and the underlying proceeding which demonstrates that the Petitioner's statement was an accurate, true, voluntary, knowing, and intelligent statement, the Petitioner is entitled to no relief on this claim.

### Double Jeopardy

114. The Petitioner alleges two separate instances where the conviction and sentence of the Petitioner supposedly violates Double Jeopardy principles. First, she alleges that Count Two of the Indictment is actually a lesser included offense of Count One such that her conviction for both is unconstitutional. Second, she alleges that the nature of the offense of Count Three makes it constitutionally impermissible to sentence the Petitioner for consecutive sentences for both Counts One and Three.

115. 2. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution consists of three separate constitutional protections. It protects against a second prosecution

43

for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. Syllabus Point 1, State v. Gill, 187 W.Va. 136, 416 S.E.2d 253 (1992).

3. The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense. Syllabus Point 1, Conner v. Griffith, 160 W.Va. 680, 238 S.E.2d 529 (1977). Syllabus Point 2, State v. Gill, 187 W.Va. 136, 416 S.E.2d 253 (1992).

Syl. Pts. 2 and 3, State v. McGilton, 229 W. Va. 554, 729 S.E.2d 876 (2012).

116. In order to establish a double jeopardy claim, the defendant must first present a *prima facie* claim that double jeopardy principles have been violated. Once the defendant proffers proof to support a nonfrivolous claim, the burden shifts to the State to show by a preponderance of the evidence that double jeopardy principles do not bar the imposition of the prosecution or punishment of the defendant.

Syl. Pt. 2, State v. Sears, 196 W. Va. 71, 468 S.E.2d 324 (1996).

117. In this case, the Petitioner fails to present even a *prima facie* case that double jeopardy principles were violated.

118. The Petitioner first claims that the child abuse resulting in the bodily injury charge was a lesser included offense of the child abuse resulting in death charge. A plain reading of the record shows these were two separate and distinct events that occurred on different dates. The testimony of defense witnesses Donna Boggs and Robert Hicks, Jr., as well as the statements of the Petitioner, clearly establish the infant had a bruise under his left eye on Saturday and Sunday—the weekend before the infant's death. This bruise was a direct result of the Petitioner throwing a bottle at the baby, striking him in the face. The child abuse resulting in death claim was based upon the Petitioner throwing the infant into the crib on top of the toy piano, causing

44

the infant's skull to fracture and other head trauma, which led to the death of the infant. The Petitioner stated this happened on Monday evening, the day before the child's death.

119. The Petitioner then argues that the indictment does not make it clear that these were two separate events, but she does not allegethe indictment was defective or insufficient.

120.        An indictment is sufficient under Article III, §14 of the West Virginia Constitution and W.Va.R.Crim. P. 7(c)(1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.

Syl. Pt. 6, State v. Wallace, 205 W.Va. 155, 517 S.E.2d 20 (1999).

121. "An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Id., Syl. Pt. 3.

122. "The requirements set forth in W.Va.R.Crim. P. 7 were designed to eliminate technicalities in criminal pleading and are to be construed to secure simplicity in procedure." Id., Syl. Pt. 4.

123. The Counts as contained in the indictment clearly follow the statutory language for each of the offenses as contained in the West Virginia Code, encompassing all of the elements of the offenses charged. State v. Wallace, supra.

124. The Petitioner argues that since Count One does not allege the specific physical injury that resulted in the death of the child, it implies that the actions as alleged in Count Two must be considered a part of Count One. Not only is this flawed logic, but the Petitioner cites absolutely no case law in support of this cross-count implication that she urges. Furthermore, the

45

Petitioner fails to cite any law that would require the State to specify within the indictment the exact nature of the injury causing the death of the child.[4]

125. The record demonstrates that the Petitioner was provided full discovery in the case and obviously had firsthand knowledge of the confession she had provided to the police, detailing the instances of abuse and timeline of events leading up to the death of the infant; therefore, she was on fair notice of the charges against which she was defending. State v. Wallace, *supra*.

126. Finally, the Petitioner is easily able to assert a conviction to guard against being tried for the offenses herein in the future. State v. Wallace, *supra*. The West Virginia Supreme Court of Appeals has explained that a conviction under a charged indictment still precludes subsequent indictment on the exact same material facts even though proof may be at variance regarding immaterial factors, such as the dates upon which the offenses were alleged to have occurred. *See* State v. David D. 214 W.Va. 167, 162, 588 S.E.2d 156, 173 (citing State ex rel. State v. Reed, 204 W.Va. 520, 524, 514 S.E.2d 171, 175 (1999)).

127. It is abundantly clear from a reading of the record that Counts One and Two are separate and distinct offenses and that a conviction on both counts, as well as consecutive sentences on those counts, do not violate double jeopardy principles. State v. McGilton, *supra*; State v. Sears, *supra*.

128. The Petitioner also alleges the child neglect charge as contained in Count

---

4 The State is not even required to include in an indictment for Murder in the First Degree the manner or means by which the death of the deceased was caused. *See* W.Va. Code § 61-2-1.

Three of the Indictment is a lesser included offense of child abuse resulting in death as contained in Count One. In support of this argument, the Petitioner states the neglect alleged, i.e., not taking the child for medical treatment, was a part of the same transaction that caused the death of the child. However, the Petitioner fails to properly analyze the offenses pursuant to legal precedent.

129.    The West Virginia Supreme Court of Appeals holds:

> The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense. Syllabus Point 1, *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981) [overruled on other grounds].

Syl. Pt. 7, State v. Noll, 223 W.Va. 6, 672 S.E.2d 142 (2008).

130.    The elements of the offense of Death of a Child by a Parent, W. Va. Code § 61-8D-2a(a), include malice and intent to inflict "physical pain, illness or any impairment of physical condition by other than accidental means." "Neglect" is not an element of this offense. Further, the offense necessitates the death of the child as a result of the abuse suffered. Finally, the statute itself indicates it does not apply to circumstances where a parent fails (without malice) to seek medical care for his or her infant. *See* W.Va. Code § 61-8D-2a(d).

131.    Further, neither "intent" nor "malice" are elements of the offense of Gross Child Neglect Creating a Substantial Risk of Serious Bodily Injury or Death, W.Va. Code § 61-8D-4(e). *See* State v. DeBerry, 185 W.Va. 512, 408 S.E.2d 91, *cert. denied,* 502 U.S. 984 (1991) (felonious child neglect does not require proof of criminal intent, interpreting W. Va. Code § 61-8D-4, child neglect resulting in bodily injury). Also, a child does not have to have necessarily

47

been seriously injured or died in order to charge this offense, but only been placed in a situation where there was a substantial risk of the same based

upon the neglect of the caretaker.

132. Based upon a simple review of the statutory elements and construction of these offenses, it is clear that Gross Child Neglect Creating a Substantial Risk of Serious Bodily Injury or Death under W.Va. Code § 61-8D-2a(a) is not a lesser included offense of Death of a Child by a Parent under W.Va. Code § 61-8D-4(e). The Petitioner's conviction of both of these offenses, therefore, do not offend double jeopardy principles. State v. McGilton, *supra*; State v. Sears, *supra*.

133. Lastly, the West Virginia Supreme Court has declined to find that cumulative punishments imposed for separate offenses arising out of the same transaction violate constitutional principles. *See* State v. Fortner, 182 W.Va. 345, 364, 307 S.E.2d 812, 831 (1990).

134. Based upon the foregoing analysis, the Petitioner is entitled to no relief on these grounds.


## Excessive or Disproportionate Sentence

135. The Petitioner failed to advance this argument on direct appeal to the West Virginia Supreme Court. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 and 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

136.    Furthermore, the West Virginia Supreme Court of Appeals holds that "sentences imposed by the trial court, if within statutory limits and if not based on some impermissible factor, are not subject to appellate review." Syl. Pt. 7, State v. Layton, 189 W.Va. 470, S.E.2d 740 (1993); Syl. Pt. 4, State v. Goodnight, 169 W.Va. 366, 287 S.E.2d 504 (1982).

137.    The Petitioner does not argue that she received sentences that were outside of the statutory guidelines for the crimes of conviction, and she further fails to allege any impermissible factors considered by the trial court when imposing such sentences.  As such, the Petitioner's sentence is not subject to review. State v. Layton, *supra*; State v. Goodnight, *supra*.

138.    The West Virginia Supreme Court of Appeals stated in Syllabus Point 5 of State v. Cooper, 172 W.Va. 266, 304 S.E.2d 851 (1983):

> Punishment may be constitutionally impermissible, although not cruel and unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense.

139.    Furthermore, the Supreme Court set forth in State v. Glover, 177 W.Va. 650, 658, 355 S.E.2d 631, 639 (1987), the applicable tests for disproportionate sentence consideration:

> In State v. Cooper, 172 W.Va. 266, 304 S.E.2d 851 (1983), we set forth two tests to determine whether a sentence is disproportionate to the crime that it violates W.Va. Const. art. III §5.  The first test 'is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society.  If a sentence is so offensive that it cannot pass a societal and judicial sense of justice, the inquiry need not proceed further.' 172 W.Va. at 272, 304 S.E.2d at 857. Cooper then states the second test: If it cannot be said that a sentence shocks the conscience, a disproportionality challenge is guided by the objective test spelled out in syllabus

49

point 5 of <u>Wanstreet v. Bordenkicher</u>, 166 W.Va. 523, 276 S.E.2d 205 (1981):

> 'In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.'

<u>Id</u>.

140. The West Virginia Supreme Court noted its reluctance to apply the proportionality principle inherent in the cruel and unusual punishment clause as an expression of due respect for and in substantial deference to legislative authority in determining the types and limits of punishments for crimes. <u>State v. James</u>, 227 W.Va. 407, 710 S.E.2d 98, 106 (2011).

141. The Petitioner was sentenced to a determinate term of forty (40) years of incarceration for her conviction of Death of a Child by a Parent. W.Va. Code § 61-8D-2a(a). The Petitioner was further sentenced to the statutory term of not less than one (1) nor more than five (5) years of incarceration for her conviction of Child Abuse Causing Bodily Injury. W.Va. Code § 61-8D-3(a). Lastly, the Petitioner was sentenced to the statutory term of not less than one (1) nor more than five (5) years of Gross Child Neglect Causing Substantial Risk of Serious Bodily Injury or Death. W.Va. Code §61-8D-4(e). Those sentences were ordered to run consecutively. [Sentencing Order, 6/14/10; Tr. 6/7/10, pg. 60-65.]

142. The evidence clearly demonstrated that the Petitioner threw a bottle at her crying infant, hitting him in the face and causing bruising under his left eye. The evidence also demonstrated that the Petitioner intentionally and forcefully threw her baby into his crib on top of a toy piano, causing a skull fracture and other head trauma. The Petitioner described hearing a loud popping sound when the baby hit the piano and also stated that the baby cried when it

occurred. The evidence further showed that, despite having the knowledge that she delivered a significant blow to the head of her infant and there being obvious reason to believe that the child was ill and/or impaired, the Petitioner failed to seek medical attention for the baby who was obviously in distress. This seven-month-old child ultimately died at the hands of his own mother. Based upon the facts and circumstances of the case, an aggregate sentence of 42-50 years does not "shock the conscience." State v. Cooper, *supra*; State v. Glover, *supra*.

143.    The Petitioner was convicted of and sentenced on three separate felony offenses involving the abuse and/or neglect of her seven-month-old infant. The infant died as a direct result of the actions of the Petitioner. It is universally accepted that the State has a compelling and necessary public interest in protecting children, perhaps our most vulnerable citizens, from abuse and neglect. *See* W.Va. Code §§49-1-1 et seq.; W.Va. Code §§15-13-1 et seq. While jurisdictions vary somewhat in their classification and punishment for child abuse and neglect depending on the facts of each case, including whether there has been abuse or there has been neglect and whether there was actual injury to the child, all see these offenses as significant. The Petitioner cites several statutes in arguing that the 40-year determinate sentence imposed for Death of a Child by a Parent is disproportionate and excessive, among them DUI with death, negligent homicide, involuntary manslaughter, and voluntary manslaughter. However, the Petitioner fails to take into consideration that Death of a Child by a Parent is a felony offense involving an intentional and affirmative act of harm to the victim by the defendant, which distinguishes it from DUI with death, negligent homicide and involuntary manslaughter. The reason the penalty can be greater[5] than that of voluntary manslaughter is precisely due to the

---

5 The Respondent states the penalty *can be* greater because the range of penalty for Voluntary Manslaughter is a definite term of imprisonment of not less than three (3) nor more than fifteen (15) years. The range of penalty for Death of a Child by a Parent is a definite term of imprisonment of not less than ten (10) nor more than forty (40)

years. Therefore, the sentence for Voluntary Manslaughter may be greater than the penalty for Death of a Child by a Parent or vice versa. W.Va. Code § 61-2-4, W.Va. Code § 61-8D-4a.

particularly egregious nature of the offense. It is quite possible for someone to commit voluntary manslaughter in the killing of a stranger to which one owes no extraordinary duty of care. The offense of Death of a Child by a Parent was created and designed to punish parents, charged with the duty to protect and care for their often defenseless children, for serious acts of intentional abuse that lead to the deaths of their own children. While the State did not allege that the Petitioner had the specific intent to kill her baby, had the same been alleged and had the jury returned a verdict of guilty, the Petitioner would be serving a life sentence. *See* W.Va. Code § 61-2-2.

144. Based upon the foregoing analysis, the Petitioner has failed to demonstrate that her sentences are excessive or disproportionate to the offenses of conviction. State v. Cooper, *supra.*, State v. Glover, *supra.* As such, she is entitled to no relief on this claim.

## Pretrial Publicity

145. The Petitioner failed to advance this argument on direct appeal to the West Virginia Supreme Court. The Petitioner also did not advance any argument that the jury was unqualified or biased due to media influence. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 and 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

146. Furthermore,

'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has

53

been abused.' Syllabus Point 2, State v. Wooldridge, 129 W.Va. 448, 40 S.E.2d 899 (1946). Syllabus Point 1, State v. Sette, 161 W.Va. 384, 242 S.E.2d 464 (1978).

Syl. Pt. 1, State v. Derr, 192 W. Va. 165, 451 S.E.2d 731 (1994).

147. One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

Syl. Pt. 3, State v. Derr, 192 W. Va. 165, 451 S.E.2d 731 (1994).

148. In other words,

'Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial.' Syllabus Point 1, State v. Gangwer, W.Va., 286 S.E.2d 389 (1982).

Syl. Pt. 2, State v. Young, 173 W. Va. 1, 311 S.E.2d 118 (1983).

149. The Petitioner never moved for a change of venue, and, therefore, never demonstrated good cause for a change of venue.

150. Furthermore, there is no basis in the record that the jury was in any way tainted by pretrial publicity.

151. While the Petitioner cites a dozen articles that appeared in local newspapers on the Petitioner's case prior to the start of trial, the Petitioner fails to mention that these articles spanned a period of over two (2) years.

152. When the Court conducted voir dire, specific inquiry was made into whether potential jurors heard any media coverage with respect to the Petitioner's case. [Tr., 9/1/09, pg. 21.] The Court went on to make more general inquiries with regard to impartiality. [Tr., 9/1/09, pg. 28-29.] When getting into defense counsel's requested voir dire, the Court again made inquiry into the potential jury pool's exposure to

54

media coverage of the matter and asked for a general show of hands as to whether any potential juror developed an opinion on the case based upon what they had seen or heard. [Tr., 9/1/09, pg. 51.] Further, the parties conducted individual voir dire with all individuals who had indicated that they had seen or heard something about the case. [Tr., 9/1/09, pg. 62-227.]

153. After this extensive questioning and the process of eliminating potential jurors for cause based upon a variety of reasons, the Petitioner agreed that a qualified jury pool of 20 jurors had been arrived at prior to the parties making strikes. [Tr., 9/1/09, pg. 245.]

154. Alternates were also selected and the finalized panel of jurors were sworn by the Court. [Tr., 9/1/09, pg. 245-257.]

155. Throughout the course of the trial, the Court admonished jurors to avoid media coverage. [Tr., 9/1/09, pg. 261-262; Tr., 9/2/09, pg. 143, 333, Tr., 9/3/09, pg. 73.}

156. There was absolutely no indication that any juror was influenced by any pretrial publicity.

157. As support for this allegation, the Petitioner cites trial counsel's statement at a pretrial hearing that the parties were hopeful a plea agreement could be worked out because of possible prejudicial treatment by a jury if the case were to go to trial. However, looking at that statement in context, trial counsel was worried about the emotional nature of the case- the fact that the death of an infant would be the focus of the trial itself- as a concern and not that the defense was worried about prejudicial pretrial publicity. [Tr., 8/10/09, pg. 6.]

158. Considering the extensive voir dire of potential jurors in this case, the Petitioner

has failed to demonstrate that pretrial publicity prejudiced her ability to have a fair trial with an impartial jury. State v. Derr, *supra*; State v. Young, *supra*. As such, the Petitioner is entitled to no relief on this allegation.

## Continuance for Pregnancy

159. "A motion for continuance is addressed to the sound discretion of the trial court and the ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion." Syl. Pt. 2, State v. Bush, 163 W.Va. 168, 255 S.E.2d 539 (1979).

160. Petitioner's counsel moved the Court to continue her trial until such time as her pregnancy progressed and she gave birth. The basis of the motion was that it could inflame the jury if they were to discover that the Petitioner, on trial for the death of her infant, was pregnant with another child. The Petitioner conceded there were no medical reasons she could not sit through trial. The concern was simply one of appearance and possible prejudice.

161. The Court, being sensitive to the basis of the Petitioner's motion, heard argument at sidebar to prevent the fact that the Petitioner was pregnant from leaking to the public. After a lengthy discussion as well as the Court having an opportunity to view the Petitioner to assess how visibly obvious her pregnancy was at that stage, the Court denied the Petitioner's motion. [Tr., 8/10/09, pg. 14-20.]

162. The Petitioner suggests that the jury was surely aware of her condition and held the same against her. The Petitioner also suggests that the situation would have been remedied with a "short" continuance to allow her to give birth. However, the Court clearly considered the Petitioner's motion and took seriously the basis therefor before denying the motion. The Court determined that, at the stage of her pregnancy at the time, the Petitioner was not showing to the point that her pregnancy was obvious. Furthermore, the Court noted that if a continuance were to

be granted, it would be months before the matter could be rescheduled considering (a) the Petitioner was still months away from giving birth and (b) the Court's docket was filling up quickly and making room again for such a lengthy trial would be complicated. [Tr., 8/10/09, pg. 14-20.]

163. Considering the Court's thorough consideration of the Petitioner's motion and reasoned denial of the same, the Petitioner has failed to show an abuse of discretion. State v. Bush, *supra*. As such, the Petitioner is entitled to no relief on this claim.

## CONCLUSION

For each of the reasons detailed above, the Petitioner fails to allege any set of facts in this habeas corpus proceeding upon which relief may be granted.

**ACCORDINGLY,** the Petition for Writ of Habeas Corpus is **DENIED.**

The Clerk shall transmit attested copies of this Order to all counsel of record. The Clerk shall further remove this case from the active docket of the Court and place it among matters ended.

Laura V. Faircloth, Circuit Court Judge
Twenty-Third Judicial Circuit

Order prepared by:
Cheryl K. Saville, Esq.
Assistant Prosecuting Attorney
State Bar No.: 9362
380 W. South Street, Ste. 1100
Martinsburg, West Virginia 25401
(304) 264-1971

A TRUE COPY
ATTEST
Virginia M. Sine
Clerk Circuit Court
By: _____
Deputy Clerk

57